(32 App. Div. 324.)

### In re WESTERFIELD et al. (two cases).

### In re ROGERS et al. (two cases).

(Supreme Court, Appellate Division, Second Department. July 11, 1898.)

1. LIABILITY OF TRUSTEE—NONPARTICIPATION IN TRUST.

If one of two trustees of an express trust is actually and deliberately excluded with the knowledge and approval of all the beneficiaries, but against his own will, from any active participation in the management of the trust, or custody of the money and securities, which are handled and controlled during a long period by the other trustee alone, he is under no obligation to maintain an active and detailed oversight of his associate, but may rest in the passive position into which he is thus forced, and will incur no liability for misappropriations of the funds by the active trustee, of which he had no actual or constructive notice.

2. SAME—MISCONDUCT OF CO-TRUSTEE—KNOWLEDGE.

But if, in such a case, he does become aware of the misappropriations, and, without notifying the beneficiaries, joins with his associate, though in good faith, in making investments which he knows to be unauthorized, in an effort to restore the depletion and protect the wrongdoer, he renders himself personally liable for the acts in which he thus participates.

3. SAME—ADVICE OF COUNSEL.

Nor is he protected by the fact that in so doing, in matters depending upon business judgment, and where he knows that the course pursued is unauthorized, he acted under the advice of counsel.

4. SAME—ACCOUNTING—ESTOPPEL.

But while, if he joins with the active trustee, though as a mere formality, and without any personal knowledge of the facts, in an accounting reciting the joint receipt of the assets, he is estopped by the decree entered thereon, he is not precluded, upon the decree being reopened, from showing facts in exoneration.

5. SAME—ACCEPTANCE OF COMMISSIONS.

The mere acceptance of commissions by a passive trustee does not render him liable for wrongful acts of his active associate for which he would not otherwise be liable.

Appeal from surrogate's court, Westchester county.

In the matter of the application of Mary J. Westerfield and Flora E. Rogers for an accounting by Thomas Rogers and William Cauldwell, as trustees under the will of Jason Rogers, deceased, and for the removal of such trustees.

Appeal from a decree of the surrogate of Westchester county, made on the 21st day of February, 1898, which charged the said trustees with the sums found due the estate under a former decree of said surrogate's court, made on the 16th day of March, 1897, settling the accounts of said trustees up to and including the 1st day of September, 1893, and further imposing liability upon said trustees for additional moneys received since said 1st day of September, 1893, to and including the date of the entry of the said last decree; also an appeal from a decree of the surrogate made on the 20th day of April, 1898, which removed Thomas Rogers and William Cauldwell from their positions as trustees under the last will and testament of Jason Rogers, deceased; also an appeal from an order made on the 31st day of May, 1898, which denied a motion made by Thomas Rogers to open the decree confirming the accounts of said trustees, rendered on the 1st day of September, 1893, and confirmed, after having been reopened for a particular purpose, on the 16th day of March, 1897; also an appeal from an order made on the 12th day of May, 1898, which adjudged Thomas Rogers to have been guilty of willful contempt in failing to comply with the decree of March 16, 1897, and further adjudging that he pay a fine of $60,000, and be confined in the county jail of Westchester county, in close custody, until said fine shall be fully paid. Affirmed in part.

Argued before GOODRICH, P. J., and CULLEN, BARTLETT, HATCH, and WOODWARD, JJ.

Edward Winslow Paige (Henry L. Stimson, on brief), for appellant. William G. Wilson, for respondents.

HATCH, J. In refusing to exonerate Thomas Rogers from liability for the devastavit of the estate by his co-trustee, Cauldwell, the learned surrogate held that the decree of March 16, 1897, conclusively established the liability of Thomas Rogers to account for the assets then shown to have been in the possession of the trustees. The verified petition which accompanied the account stated that the trustees had possession and control of such assets, and the decree, being founded upon such petition and account, concluded Thomas Rogers from being heard to question the same. We agree with the learned surrogate that the decree had the effect of establishing the liability of Thomas Rogers to account as therein directed, and so long as the decree stands he may not be heard to question it or his liability under it. Code Civ. Proc. §§ 2552, 2743; In re Waring's Estate, 1 App. Div. 29, 36 N. Y. Supp. 529; In re Underhill, 117 N. Y. 471, 22 N. E. 1120. While this law is sound, it by no means follows that Thomas Rogers was liable on account of such decree for

the devastavit which had taken place, subsequent to the rendition of such account, by act of his co-trustee, even though the whole sum of the devastavit was known to Thomas Rogers at the time of the entering of the final decree, on March 16, 1897. The account was a joint account. The decree entered thereon did not purport to charge or find that the fund was in the possession of one to the exclusion of the other. It did establish a joint possession, and liability therefor for the fund, as reported at that time. If there was not on hand at such time the amount of money represented by the account and decree, yet the effect of such decree would be to conclusively charge each trustee personally therefor. But if, subsequent to such decree, the money was misappropriated by one trustee, without the fault or neglect of the other, we think that the trustee without fault might be permitted to show such misappropriation of the funds in existence at the time of the decree, and be relieved from liability on account thereof. In principle, such condition would not be different from that which permits the co-trustee to exonerate himself from liability for his co-trustee's devastavit when called upon to account. In any event, the decree would not have the effect of conclusively charging Thomas Rogers for the devastavit of the estate which arose subsequent thereto, in the due administration of the estate, by act of his co-trustee, assuming that he was guilty of no wrong or negligence in the matter. It would then be evidence simply of Thomas Rogers' acts in connection with the administration of the estate, as bearing upon the question of his liability for the fault of his co-trustee. At the time when the account was rendered, the amount of money misappropriated by Cauldwell was the sum of $20,000, and for such sum the settlement of that account and the decree entered thereon fixed the liability of Thomas Rogers. But it established it for no more than that sum, so far as deficit thereafter arose through the misapplication of moneys by Cauldwell. The remainder of the deficit was thereafter created by Cauldwell, and the decree constituted no obstacle to Thomas Rogers in showing facts which exonerated him from liability therefor. This being the operative force of the decree, we are asked to examine the evidence, in order that we may determine whether the decree should be opened to permit proof to be given in exoneration of Thomas Rogers from liability for the $20,000 which the decree establishes, and also to consider if he should be relieved from the whole of his co-trustee's devastavit, and in connection therewith to pass upon the propriety of his commitment for contempt, in the present condition of the parties and the trust estate, for not obeying the decree of March 16, 1897.

The learned surrogate, in addition to holding that the decree entered in March, 1897, is a binding adjudication as to the joint custody of the trust funds, has gone much further, and held that, independent of such decree, the trustee Thomas Rogers is liable for the devastavit of the estate by his co-trustee. In this respect we think the learned surrogate is in error. We think the undisputed facts fairly show that prior to the 8th day of December, 1895, Thomas Rogers is not chargeable with the misapplication of the funds in the hands of his co-trustee, and is not responsible therefor. It ap-

pears that after the qualification of Columbus B. and Thomas Rog--
ers as trustees under the will of Jason Rogers, and as early as 1876,.
Columbus took almost entire charge of the great bulk of the estate,
and, for all practical purposes, excluded Thomas from participation
in its management. Thomas Rogers seems to have been regarded by
the cestuis que trustent as a person of small business capacity, im-
provident in the management of his own estate, and addicted to
habits which, to some .extent, disqualified him from assuming and
properly managing a large estate. This is evidenced by a history of
his business life, as appears in the record, quite as much and as sat-
isfactorily as the oral and written testimony. In an early day he was.
the treasurer of the Rogers Locomotive Works, but lost this posi-
tion. Then he seems to have tried the railroad business for a short
time, in St. Louis, Mo., but abandoned the place. He again engaged
in similar employment at Providence, R. I., and after a short inter-
val surrendered that place. This seems to have covered his active
business life, except as he discharged some small duties in connec-
tion with his trust. He was 24 years of age in 1868, when his father
died, and is now about 54. During this period he has been, at least
at times, oppressed with debts incurred for the support of himself
and his family, and importuned Columbus B. Rogers, when acting
as trustee, to relieve his necessities, and has anticipated his share
of the estate to quite a large amount. In one of his letters to Co-
lumbus B. Rogers he says: "I have now turned over a new leaf,
positively for good, and propose to keep untarnished from any dis-
grace the name of Rogers." J. S. Rogers, a son of Thomas, testified
that Mrs. Westerfield stated to him that his father "was a drunk-
ard and a spendthrift. Said she recalled his opportunities with the
Rogers Locomotive Works. * * * Said he had not taken ad-
vantage of them, and wasted all of his own money." This condi-
tion makes us prepared for what is evidently the fact, and the rea-
son which prompted Columbus B. Rogers to assume the active man-
agement of the trust and its securities, and to receive and disburse
substantially all the cash received and paid out. Upon this subject
the surrogate finds:

"Between 1876 and June 7, 1886, Thomas Rogers was to some extent ex-
cluded from control of the funds and securities of the estate by Columbus B.
Rogers, and against his own will." "After 1876, and until June 7, 1886, all
checks drawn upon the bank accounts of the estate were signed by Columbus
B. Rogers alone. At about the same time when he deposited the cash in the
Hanover National Bank, as aforesaid, Columbus B. Rogers placed the se-
curities of the estate in the safe-deposit vaults of the New York Stock Ex-
change, and kept them there during his administration, during which time
Thomas Rogers did not visit said vaults."

The surrogate was requested to find that Thomas Rogers' exclu-
sion was absolute as to the cash and securities of the estate and
against his will. This request was refused. We think it should
have been found. After 1876, Thomas Rogers, for a period of 10
years, and until 1886, when Columbus B. Rogers resigned as trus-
tee, had no charge of the funds of the estate nor the control of its
securities. He signed no checks, and did few acts in connection with
the estate. The letters which he wrote, one of which appears in the

record under a date as early as June, 1877, show that he then complained of his exclusion from the management of the estate to Columbus B. Rogers; and this was followed by other letters, the last of which was dated June 9, 1896. In these letters he asserts that he had faithfully discharged his duties as trustee so far as he had been permitted to act, and requests of his co-trustee an interview in respect to the trust property. To some of these letters Columbus B. Rogers replied. As to others the attorney for the trustees, employed by Columbus, replied, and directed Thomas that, if he had anything to communicate, he could do so with the attorney, who was authorized by Columbus to see him. Upon one occasion he suggested a change in a tenant who occupied a small property of the estate. The matter was promptly decided, and probably for good reason, against the suggestion, by Columbus. At another time he complained of an agent of the estate, asserting that he had been insulted by him, and that he was dishonest. This complaint seems to have been ignored by Columbus, and the agent was continued. There is no dispute of fact in connection with these matters, and they establish the exclusion of Thomas Rogers from the management of this estate. In addition to this, it is established with almost equal certainty that the petitioners had knowledge of such exclusion and assented thereto. There is a finding by the surrogate that, prior to 1886, the petitioners Mary J. Westerfield and Flora E. Rogers distrusted the business capacity of Thomas; but a request to find that they knew Thomas was excluded from the possession of the funds and securities of the estate by Columbus B. Rogers, and approved of such exclusion, was refused. We think it should have been found. They had actual notice that Columbus had control of the cash of the estate by payments to them of checks drawn by Columbus B. Rogers as trustee alone, and these they continued to receive for a period of 10 years. Such course of business, together with the admitted fact that at no time would they consent that Thomas Rogers should act alone as trustee, was sufficient to charge them with notice that the active management of the estate was being carried on by Columbus. Banks v. Wilkes' Ex'rs, 3 Sandf. Ch. 99. If, however, we accept the view of the surrogate that they did not have knowledge of the actual exclusion of Thomas from the management of the estate, such fact does not change the position as respects the liability of Thomas. It is clear that the rights of these trustees were equal. One had as much right to the possession of the cash and securities as the other. The payment of dividends by the Rogers Locomotive Works, which was the most prolific source of income to the estate, was made, during the period above mentioned, to Columbus B. Rogers, and receipted for by him; and he also had the possession of the securities of the estate.

It is not contended but that the management of the estate by Columbus B. Rogers was prudent and successful, and at no time was there any reason to suppose that it was otherwise. Under such circumstances, the only right that Thomas Rogers would have had was to see and examine the books, securities, and the cash account. He could not have obtained possession either of the securities or the

cash. If he had attempted resort to legal remedy, and haled his co-trustee into court for the purpose of compelling his recognition as a trustee, it is manifest that he would have been met by proof of his business incapacity and his bad habits, and his application to change the existing order of things would have been justly resisted by his co-trustee and by the cestuis que trustent. The condition which then existed was beyond doubt created by the trustee Columbus with the acquiescence of the petitioners. It is not difficult to see what would have been the result of such a proceeding. No court, upon such facts, would have ordered any change made in the administration of the trust. It is true that during this period receipts were taken for moneys paid in the name of both trustees, and Thomas appears to have joined in some conveyances; the latter for the reason that his signature and assent were necessary to convey a good title. So far as the receipts are concerned, they added nothing to the liability of Thomas Rogers, for the payments which they represented were made by the checks of Columbus B. Rogers as trustee alone. It is also true that Thomas joined with Columbus in the account which was rendered by the trustees; and, while he may have been technically bound and liable for the contents of the account, yet it appears without dispute that this account was made up by Mr. Levy, the attorney, and of its contents Thomas Rogers had no knowledge, except as he was informed by Levy and Columbus that the same were correct, and represented the true condition of the affairs of the estate. It is therefore evident that, so far as he was bound by any decree entered upon such account, if there had been waste and mismanagement upon the part of his co-trustee, of which he had no notice, upon such fact being discovered he would have been equitably entitled to have the decree opened, and opportunity given to relieve himself from responsibility therefor.

Such was Thomas Rogers' relation to this estate down to the time when Columbus Rogers sought to be relieved as trustee. Thomas Rogers then desired, as the proof shows, to be admitted to the active management of the estate. It is evident that his desire in this respect was not approved by Columbus, and was resisted by the petitioners themselves. In this matter Thomas was powerless. By the terms of the will, the right to appoint a trustee was vested in the widow of Jason Rogers, and the selection of the successor to Columbus Rogers became the subject of serious consideration. It does not seem that any reflections were cast upon the integrity of Thomas Rogers. On the contrary, all expressed confidence therein, and such confidence seems to have been justified; for it does not appear, so far as he had dealings with the estate, but that he accounted for all the moneys which he ever received, and charged the estate no more than the law permitted him to charge. But that the cestuis que trustent opposed the delivery of the estate to him is clear. At one time the appointment of Judge Gifford seems to have been agreeable, and papers were drawn to accomplish that end, when Mrs. Westerfield, the petitioner, objected, and Judge Gifford refused to act. Mrs. Westerfield desired to be appointed herself, but this did not seem to meet with favor. Finally William Cauldwell was se-

lected, and it is evident that this selection met with unqualified approval by every person interested. Mr. Cauldwell was a man who was supposed to be of abundant means; was engaged in a prosperous business, and had held many offices of public trust; was at one time president of a bank; and was an old friend of the Rogers family. For business capacity and personal integrity his reputation was very high. That Mrs. Westerfield cordially approved of this appointment, and cordially disapproved of Thomas Rogers acting, is clearly evident. Proof is given that she so stated, and her failure to appear upon the trial, after abundant notice by the attorneys for the trustees that she be produced, is to be taken as conclusive evidence of the truth of the statements of the witnesses, both as regards her opposition to Thomas Rogers and her approval of the selection of Cauldwell. It is also evident that it was the purpose of Columbus B. Rogers, with the acquiescence of the cestuis que trustent, to surrender the securities and cash of the estate into the personal custody of Cauldwell; and while Thomas Rogers was present at the time of the delivery of the securities and the cash, and receipted for the same to Columbus B. Rogers, yet it is evident that he was so required to be present for the reason that his formal receipt was essential for the conclusive protection of Columbus B. Rogers. Whether the version of Mr. Levy, the attorney, or of Thomas Rogers, as to what then transpired, be accepted, the essential fact remains unchanged that the securities of the estate which were then present were delivered into the personal care and custody of Cauldwell, and the check for the cash then on hand was made out by Columbus B. Rogers to him, and thereafter Cauldwell took possession of the securities, deposited them in a box in the trust company of which he alone had the key, and deposited the funds of the estate in his own name as trustee, so that checks would only be honored upon such account when signed by Cauldwell alone as trustee.

It is therefore evident that the purpose of all the parties was to vest in Cauldwell the control of the securities and funds and the active management of the estate, and to continue in this respect the same course that had been previously adopted by Columbus B. Rogers. The checks drawn by the Rogers Locomotive Works were delivered to Cauldwell, who deposited the same in his account, and receipted for them in his own name; and this method was continued during the period of Cauldwell's administration, down to the 8th day of December, 1895. During this period the amount of dividends paid to Cauldwell by the Rogers Locomotive Works was upwards of $170,000; and during this time Cauldwell paid to the petitioners, by his check as trustee, an income to which they were entitled from the estate, and this involved upward of 40 payments. The petitioners also communicated with Cauldwell personally in respect to the payment of income, and several letters from both appear in the record. It does not appear that they ever at any time applied to Thomas Rogers or held any consultation with him upon this subject, or any other connected with the estate. It therefore satisfactorily appears that, so far as the adult cestuis que trustent are concerned, as well as Cauldwell, the co-trustee, it was known by a uniform course of

dealing, for a period of 14 years, that Thomas Rogers neither had the funds of the estate nor control of its securities, and did not receive or disburse its funds.

The surrogate has found most of these facts, and as to those not found the evidence satisfactorily establishes them. In 1888, as the surrogate has found, William Cauldwell began drawing from the account, upon checks signed by himself, moneys which he applied to his own use. These withdrawals of money were not entered in the ordinary books of account kept by him as trustee, but were indi-- cated on the stubs of the bank check books, either as payments to Cauldwell or as "call loans." As to most of these transactions, the moneys thus withdrawn were paid back by Cauldwell into the trust fund. But on September 1, 1893, when the account of William Cauldwell and Thomas Rogers was presented to the surrogate for settlement, these call loans amounted to the sum of $20,000, which was then outstanding, and to that extent there was a deficit in the account of that sum, which was represented as cash on hand and in the possession of the said trustees. Thereafter William Cauldwell continued to draw, in like manner and in like sums, until such withdrawals, up to about the 8th day of December, 1895, amounted to the sum of $133,000. The surrogate has also found, upon evidence sufficient for that purpose, that upon the 8th day of December, 1895, Thomas Rogers was informed of the misapplication of these moneys, and substantially of the true condition of the fund. Cauldwell was at this time possessed of certain real property known as the "Empire Hotel," upon which there was a first mortgage of $450,000, and a second mortgage of $60,000; and also of certain lots known as the "Jerome Avenue Lots," unimproved, and subject to a mortgage of $10,000. It does not appear what the value of this hotel property and the lots was. Cauldwell was questioned in this respect, but was not permitted to state his opinion thereon. It did, however, appear from his testimony that the valuation which he placed on the Empire Hotel property was between $800,000 and $900,000, and upon the Jerome avenue lots, above incumbrance, $50,000. Rogers never had any appraisal of these properties made, and seemed to have accepted Cauldwell's statement of their value. Immediately after the interview with Cauldwell, Thomas Rogers applied to counsel for advice. He made no disclosure of the true state of affairs to his cestuis que trustent, and they remained in ignorance of the true condition of the accounts until after the 16th day of March, 1897. Under the advice of counsel, Thomas Rogers consented to the conversion of certain mortgages of the estate into money, and to advances to Cauldwell therefrom, on the 3d and 6th of January, 1896, of $18,202.42 and $35,000, respectively. Cauldwell, without consultation with Thomas Rogers, had previously, and on December 11th, appropriated $10,000 of the trust funds for the payment of interest upon the $450,000 mortgage. Subsequently, and in the latter part of 1896, Cauldwell and Rogers, acting together, negotiated for the purchase of the $60,-000 mortgage, and purchased the same with the funds of the estate for $52,000. The moneys which Rogers permitted Cauldwell to take, and which were used to purchase the second mortgage, were pro-

cured by calling in money loaned upon two mortgages, one for $75,-000, and the other for $85,000, which were securities owned by the estate. The amount which Cauldwell had taken from the estate at the time when he informed Rogers was the sum of $133,000; and, with the loans to Cauldwell and the $10,000 taken by him to pay interest, the whole amounted to the sum of $197,000. About November, 1895, Cauldwell and Rogers paid, as interest upon said hotel property, the sum of $11,250, and about January 1, 1897, Cauldwell borrowed from the trust estate the further sum of $5,000. As security for those sums of money, Cauldwell deeded to the trustees the hotel property and the Jerome avenue lots, and at the time of the last payment of interest conveyed other property, known as the "Peconci Bay" and the "Mamaroneck" property; and, as security for the $5,000, conveyed four pieces of property, known as the "Fulton Street Apartments," in the city of Brooklyn. He also conveyed to the trustees certain other property in the city of New York, Long Island, Toms River, Lake George, and Yonkers, and five lots at Sorento, in the state of Maine. Cauldwell also transferred the furniture in the hotel, which was subject to a chattel mortgage in the sum of $14,000.

It does not appear that in any of these transactions Thomas Rogers was actuated by any dishonest motive, and evidently intended to secure the estate from loss on account of the misapplication of the money by Cauldwell. He took no steps that he was not advised by counsel to take, and the advance of the moneys and the securities which were taken were the result of advice received. It is doubtless the fact that Rogers was not only actuated by a desire to save the estate, but at the same time was willing to do all in his power, which he might legitimately do, for the protection of Cauldwell.

It is upon substantially these facts that Thomas Rogers' liability has been determined to be co-extensive with the amount fixed by the decree of March 16, 1897, the misapplication of the funds by Cauldwell, and the subsequent advances made to him, and paid out, in an about securing the hotel and other properties, which sums amount, in the aggregate, to about $254,000. We are therefore brought to consider whether the legal relation which Thomas Rogers bore to this estate charges him with liability for the misapplication of the funds by his co-trustee. It is said that he is so bound, for the reason that he joined in the accounting with Columbus B. Rogers as trustee. But, as to this circumstance, it is undisputed that his joinder was a mere formality, and for the facts contained in the account he relied upon the attorney and his co-trustee. While it is true, as we have seen, that he is doubtless estopped by the decree entered thereon, yet he is not precluded from showing, as to subsquent transactions of his co-trustee, what the true status of his position was as a trustee, even though he may be technically bound by the recitals in the petition and the decree entered thereon. And the undisputed facts which upon this hearing were received in evidence, both from the lips of Thomas Rogers, and Levy, the attorney who drew the account, show that the account was made up by Levy, and Rogers testified to what is undoubtedly the truth, known

to the petitioners, that he had no knowledge of such account except as he was informed. We do not think that the act of joining in the account, and consenting to the decree thereunder, in view of the explanation which now appears of such act, can operate as an estoppel, and prevent him from now taking advantage of facts which exempt him from liability, with which he is presently sought to be charged. At least, it does not now preclude the court from a consideration of such matters in passing upon the question of his present liability.

The further ground upon which he has been held liable is that he was guilty of gross negligence in the management of the trust estate. This only has practical force in the present application when applied to his acts after the appointment of Cauldwell as trustee. As we have already seen, it was the purpose of all concerned, except Thomas Rogers, that Cauldwell should step into the shoes and occupy the place and perform the duties which had theretofore been performed by Columbus B. Rogers; and we think it a necessary presumption, based upon the proof, that it was the expectation of the new trustee, and of all the persons interested, that Thomas Rogers should perform no other or different acts in connection with the estate than he had been permitted to perform since 1876. It is quite as evident that he could have enforced no more legal remedies against Cauldwell prior to his deficits than he could have enforced against Columbus B. Rogers, and it seems equally certain that the position of the petitioners and the other cestuis que trustent interested would have been the same, as we have already observed, in relation to Columbus B. Rogers. It is said that he did nothing. The answer is that he was expected to do nothing, and the custody of the estate was purposely so placed that he should not be able to do anything, except as necessity required his joining in some act. What could he have done? It is said that he could have examined the securities. But up to December, 1895, there had been no change in them, and, had he examined, he would have found them intact. It is said that he should have examined the books. Had he been permitted, and done so, aside from the check books they would have been found correct, representing the true state of the securities on hand and moneys received and their disposition. There was nothing about them which would have excited suspicion. Had he examined the check books, he would have found therein the account of "call loans." This, of itself, was not calculated to arouse suspicion. The will under which the trustee was acting authorized loans of such character; and, in the account rendered in 1893, "call loans" was therein set out to the amount of $20,000, and seems to have excited no suspicion upon the part of any person interested in the trust funds, and was passed without comment. The only matter which an examination of the check books would have disclosed was that in some instances the transaction appeared as between Cauldwell personally and the estate; and from that, by tracing up the amount on hand, there would have been disclosed the dealing of Cauldwell with the estate. But nothing short of that would have disclosed the character of the transaction, or the misapplication of funds by Cauldwell. To have made

all of this examination would have constituted, in high degree, diligence and care; and we think that had Thomas Rogers at any time contented himself with examining the securities and the books of the estate, and did not pursue his investigations sufficiently far to disclose the misapplication of funds by Cauldwell, he could not justly be chargeable with negligence. In view of the circumstances. of the case, the course of dealing with the trust estate for the long period of 14 years, and the evident desire of the petitioner and of the other cestuis que trustent that it should be managed and controlled to the exclusion of Thomas Rogers, it seems a somewhat harsh rule which charges him with negligence for not actively interposing and examining into the management, and which fastens liability upon him for the peculations of his co-trustee, when his attitude was what the petitioners and the cestuis que trustent had produced, and the course of management such as they desired. Under such circumstances, it is by no means certain that he would have been vouchsafed any information by Cauldwell. He had no reason to believe that his application to such an end would be received with any more favor that were his previous applications to Columbus B. Rogers. He was a passive trustee, made so by the active efforts of the petitioners, and acquiesced in by all the parties. Under such circumstances, we do not think he was guilty of gross negligence. Indeed, we think he was guilty of no negligence, under the settled law of this state.

One other circumstance requires attention. In 1892 Thomas Rogers, desiring money, applied to Cauldwell to obtain it, and Cauldwell consented to the sale of certain United States bonds, which were taken from securities belonging to the estate of Flora E. Rogers and sold, producing the sum of $26,000. This sum was delivered to Thomas Rogers, and in return he gave a mortgage upon his share of the estate for a corresponding amount. This transaction was not entered in the books, and was treated practically as a substitution of securities. There was no attempt at concealment of the matter, as the mortgage was reported in the account of 1893, and received the sanction of the parties interested, and the decree of the surrogate sanctioned the transaction. It was an undoubted security, for the amount drew 5 per cent. interest as against a lesser sum for the bonds, and the parties interested were quite willing it should remain. The inference, however, which is sought to be drawn from this transaction, is that, as it was an improper use of the securities of Flora E. Rogers, it should have put Thomas Rogers upon his guard against the administration of the estate by Cauldwell. While it was not a prudent act upon Cauldwell's part, yet no amount of reasoning can produce a condition from which it may be said that the estate was less secure after the transaction than it was before, and we are not able to see that thereby Thomas Rogers ought to have taken notice that Cauldwell was abstracting money from the estate without security. At the most, it only showed a willingness to accommodate, so long as the estate was secure, and in fact it was not thought to be wrongful by any one else, although all had notice of the substituted security. Upon this subject the surrogate finds a

practical exoneration of Thomas Rogers about this transaction, and, under the circumstances, we think it was not such a departure from careful administration as required inquiry by Thomas Rogers into all the affairs of the estate. The duty which a co-trustee is under to his cestuis que trustent has been stated many times. In the case of co-trustees, it is probably defined as fully and as satisfactorily. in Croft v. Williams, 88 N. Y. 384, as in any other authority, and in these words:

"The general rule is that the executor is responsible for his own acts, and not for those of his associate; so that if he receives and misapplies the money, or does any act by which it gets to the hands of the other, who diverts or wastes it, and but for which act the latter would not have had it, a liability to make good the loss results. * * * If the executor is merely passive, and simply does not obstruct the collection or receipt of assets by his associate, he is not liable for the latter's waste; but where he knows and assents to such misapplication, or negligently suffers his co-executor to receive and waste the estate when he has the means of preventing it by proper care, he becomes liable for a resulting loss. Sutherland v. Brush, 7 Johns. Ch. 17; Adair v. Brimmer, 74 N. Y. 566. Mere assent to the co-executor's receipt of the funds is not enough. In the case last cited all the money of the estate was received and disbursed by the common agent of all the executors, and advances were made to a co-executor for his personal use, with the knowledge and express assent of his associate. Ordinarily, in the collection of assets, the rights of each are alike, and one has not control or supremacy over the other. One, therefore, may sit passive, and see the other receive funds of the estate. and, making no objection, be deemed to assent, but that does not make him responsible for what has been received. He must in some manner know and assent to the misapplication. He must be a consenting party to the waste, or neglect some duty consequent upon his knowledge of a misapplication intended or in progress. Williams v. Nixon, 2 Beav. 472. A wrong done or a duty omitted must lie at the foundation of his liability."

In all of the cases cited by the learned surrogate to support the conclusion which he reached, or relied upon by the respondent to uphold the decrees and orders made, not one in any sense limits the force of the language used in this case, or weakens its vigor as a living authority. Many cases before and since abundantly support its doctrine. Cocks v. Haviland, 124 N. Y. 426, 26 N. E. 976; Bruen v. Gillet, 115 N. Y. 10, 21 N. E. 676; Monell v. Monell, 5 Johns. Ch. 283; Banks v. Wilkes' Ex'rs, 3 Sandf. Ch. 108. Within the above authorities, it seems clear that as the purpose had been for 14 years to remove the active management of the estate from the control of or participation in by Thomas Rogers, and as such fact was well known to all parties in interest, acquiesced in, and approved of, by the petitioners, neither obligation nor duty to the estate required that he should make active effort in and about finding out the state of the trust thus committed to the management of the trustee, who was in fact selected by the voice of all. Thomas Rogers could only be held liable provided he in some manner knew of the misappropriation of the funds in such sense that he could be regarded as a consenting party thereto. Or he must have had such knowledge of the waste, or of matters connected therewith, as devolved upon him a duty of inquiry and active exertion to prevent loss. But so long as the affairs of the estate were apparently being conducted by the same methods and in the same manner as they had theretofore been, in the absence of some circumstance, act, or condition which would naturally excite

suspicion, or which would call for inquiry, by a person ordinarily prudent, we think he might safely repose the same confidence in his co-trustee that had been reposed in him by the cestuis que trustent. As we have seen, there existed no such circumstances in this case, and nothing transpired to arouse the suspicions of a person ordinarily prudent, prior to the disclosure made to him by Cauldwell in December, 1895. Wilmerding v. McKesson, 103 N. Y. 329, 8 N. E. 665; In re Myers, 131 N. Y. 409, 30 N. E. 135. In Re Niles, 113 N. Y. 547, 21 N. E. 687, somewhat relied upon by the court below, nothing is found which in any sense changes the rule of the foregoing cases. It was said in that case:

"He who fills a position of trust conjointly with others cannot remain passive, when he knows of irregular acts by his associates, without coming equally under the judgment of the law for the consequences. Mrs. Miller was bound to inform herself with respect to the affairs of the estate, and to inquire as to the use which was made of its assets."

In that case Mrs. Miller was associated with Niles, who undertook to make loans and investments of the funds of the estate. Some were irregularly made, and were improperly taken in the name of Mrs. Miller, during the lifetime of her mother. But Mrs. Miller was informed of such fact, and of the investments, and the finding was that Niles informed her concerning the investments, upon her request for information, and she assented thereto, and stated that she did not object to any one of the investments when she heard of it. Niles having failed, attempt was made by Mrs. Miller to charge all the losses upon him, and it was held that she was bound by the acts to which she had assented and as to those in which she passively acquiesced. This is quite a different case from the one now before us. Mrs. Miller knew, or had the means of obtaining information by mere inquiry. She was consulted, and expected to express approval or disapproval. She possessed all opportunity, and was expected to keep herself properly informed. Under such circumstances, she became bound to seek for such information, and could not lie passive without acquiescence, in the absence of fraud or deception by her co-executor. In the present case, Thomas Rogers neither knew, nor had the means of knowing, the state of the accounts, unless he applied for such information, and, unless he met with better success in this respect with Cauldwell than he did with Columbus B. Rogers, he was not likely to obtain information upon request. If he could have so obtained it, yet he had no reason to suppose that it was essential to the preservation of the estate. Cauldwell, as we have seen, was a man of high standing, and of approved integrity and business capacity. Under similar circumstances, Mr. Justice Bradley said:

"When it was established that without aid of the defendant the two executors, Harrison Cocks and Barlow, took the property of the estate into their hands, and assumed the active duty of its management; that none of it came to her possession; and that she was merely passive in respect to it,—the burden was cast upon the plaintiffs to prove some facts or circumstances having relation to the character or habits of those persons, or to the manner they apparently were executing the trust, which would fairly justify suspicion that they were or might be chargeable with its mismanagement. In that case

it may be that their co-executor would be called upon to investigate, and, if necessary, to cause them to render an account, and thus present the condition of the fund, with a view to such direction as the situation should require for its protection and the proper disposition of it. There was no fact found, nor does there appear to have been any evidence, to permit the conclusion that Mrs. Haviland, before the failure of the firm of Cocks & Barlow (composed of the two acting executors), had any reason to suppose or apprehend that they would divert the fund set apart for David's family from the purpose directed by the will." Cocks v. Haviland, supra.

The learned counsel for the respondents relies upon Earle v. Earle, 93 N. Y. 104. In that case there was no exclusion of the executor sought to be charged from the management of the estate. He simply chose to permit his co-executors to manage the same, collect the assets and disburse the moneys, and by so doing constituted such co-executors his agents. This he did voluntarily, making no effort to inform himself of the acts of his co-executors, or in any manner to look after the estate; and it was held that he could not accept such a trust, and remain supinely indifferent to the duties which it imposed, but that he must act with due caution and vigilence. There was no circumstance in that case showing, or tending to show, that, by the common consent of all the adult parties in interest, a trustee had been selected who was expected to manage the whole estate. Indeed, the case was disposed of upon the assumption that the trustee might have acted in respect to all the matters connected with the estate as freely, fully, and without hindrance as could any other executor. His indifference to the trust-estate matters was therefore held to constitute gross negligence, as thereby the estate was lost. The rule, however, was therein recognized that an executor is not liable for acts of a co-executor which he has not the means of preventing or guarding against, or from which he has no reason to fear a loss to the estate. Under such circumstances he is only required, where he may exercise the means, to observe some degree of watchfulness and care over the acts of his co-executor. It is evident that we have quite a different case now before us than the court was considering in the Earle Case. The points of difference are readily apparent from the facts which we have before recited, and do not call for further comment. We shall be quite ready to uphold the doctrine in the Earle Case upon facts warranting its application, and we do not now, by this decision, extend the rule a hair's breadth beyond the doctrine which holds trustees to a rigid accountability for their acts.

It is also asserted that liability attaches to Thomas Rogers by reason of his having joined in the accounts rendered, and accepting commissions for administration. As to the first consideration, we have seen that in fact Thomas Rogers knew nothing about the matters stated in the account, except as he was informed. It was not expected that he should; and, while he was bound by the decree, he is not precluded from showing facts in exoneration, upon the same being opened for that purpose. In adddition to this, he did look after some small matters connected with the real estate, and the case presented was, therefore, in some sense, a division of duty in administration; and, where such condition exists, one trustee is not

liable for the acts of the other, under circumstances involving no neglect of duty (Nanz v. Oakley, 120 N. Y. 84, 24 N. E. 306), and while bound by the decree, as we have seen, he may be permitted to establish exoneration.

The trustee is entitled to his fees as a matter of right, and he is not deprived of such fees by reason of the fact that his co-trustee does the greater share of the work while he remains passive. The basis of liability is founded in a wrong done or a duty omitted, and this must be in respect of some act of administration. The mere acceptance of commissions does not establish either. Liability must lie in other considerations, and, when found to exist, charges the party; but he is not even then deprived of his commissions, as appears from allowances made in Bruen v. Gillet, supra, and Adair v. Brimmer, supra. We are therefore unable to find in any act sufficient from which it may be said that Thomas Rogers was guilty of any wrong or neglect sufficient to make him liable for the misapplication of funds by Cauldwell. A different condition at once arose when Thomas Rogers was informed by Cauldwell of his dereliction of duty. That moment he became charged with an active, affirmative duty, which he was required to discharge. This imposed upon him immediate action to prevent Cauldwell from further continuing in the management of the estate. It was then the duty of Thomas Rogers to communicate with his cestuis que trustent, and, while his failure to so communicate does not have the effect of charging him with the prior misappropriation of moneys by Cauldwell, yet it does have the effect of making him liable, when taken in connection with his subsequent acts, for the investments which he thereafter made, and for the disposition of the securities of the estate. The cestuis que trustent became entitled to know and be consulted as to the steps to be taken to prevent further loss, and to secure such as the estate had already suffered. Thomas Rogers became personally liable in all of the matters in which he thereafter acted. He knew that an investment by third mortgage was not a proper investment for the trust estate, as he so stated; and further advances to Cauldwell were so evidently improper, unless deemed by all interested as being necessary to preserve the estate, that Rogers must be held to have acted upon his own responsibility, and became, therefore, personally liable to justify the disposition made of such property and funds. It is undisputed that in all of these matters Rogers acted under the advice of counsel, and took no step without consultation. Indeed, the written evidence shows that the counsel originated for the most part the course of dealing with the property transferred by Cauldwell, and advised that it was proper to make the payments which were made. Advice of counsel, however, cannot be held to protect. It still remains that the questions presented were to be solved by business judgment. It was known that the security received was not proper security for the investment of trust funds, and good faith in action, or poor judgment in determining, cannot avail as an excuse, for it must be treated as a misapplication of the funds; and as the responsibility rested with Thomas Rogers, and he assumed it, liability for the act must follow as a consequence. He was

therefore properly charged by the surrogate for these investments. Nor does this rule impose any hardship. The property which is the subject of investment may be sold, and, if it produces sufficient to cover the funds which have been placed in it, then no loss will have been sustained. If it does not, then Thomas Rogers must make up the deficiency.

We come now to the proceedings by which Thomas Rogers was punished for contempt and committed to jail. It seems incongruous that the motion to punish Cauldwell, confessedly the person who has caused all the trouble, should be denied, and that Rogers should be made subject to the extreme rigor of the law. However, Thomas Rogers may not complain, as he is only to answer for his own wrong, and his plea is not available that another should also suffer. It seems that the moving cause which conduced to this result was the consideration that Cauldwell had turned over all his property, and that Rogers had not. But Rogers was the moving cause which procured title to all of Cauldwell's property to be vested in the estate, and, if it produce anything like the value which Cauldwell placed upon it, there would seem to be no prospect of a loss to the estate. In any event, we think that in respect of this property Rogers' position should be regarded quite as favorable as that of Cauldwell. This property should be directed to be sold, and its proceeds be applied to the credit of the estate, and the contempt proceedings be held to await the result. It should be borne in mind that the whole of Rogers' interest in the estate is covered by the lien of this decree, and that the property which Cauldwell deeded went to the estate. If Rogers possesses any personal property, it may be reached by process, but it would seem, from the record, that he does not possess any. His position, therefore, is that the estate is protected by all of the real property which he owns or in which he has an interest. The estate also holds the property in which he made the improper investment. He is therefore in no position to raise money upon his estate to meet the amount of the fine imposed. We think, under such circumstances, that the decree operates with unnecessary harshness, and that relief for this estate will come quite as readily and as speedily by ordering a sale of the property transferred by Cauldwell, and applying its proceeds; and if then there be any deficiency, and such deficiency be not promptly paid, proceedings can be renewed against both trustees.

The order removing the trustees was proper, and was a just exercise of power. Such order does not rest upon any of the decrees especially, but upon the facts appearing in the record.

Our conclusion, therefore, is that the order denying the motion to open the decree of March 16, 1897, be reversed, and said decree be opened so far as to permit Thomas Rogers to give proof in exoneration of his liability for the $20,000; that the decree of February 21, 1898, so far as it charges Thomas Rogers with liability for the misapplication of funds of the estate by William Cauldwell, prior to the 8th day of December, 1895, is reversed, and in all other respects it is affirmed; that the order adjudging Thomas Rogers guilty of contempt, and imposing a fine of $60,000, and for omitting to pay

commits him to jail, in close custody, is reversed, with leave to renew if there be any deficiency, for which Thomas Rogers is personally liable, upon a sale of the property transferred to the estate by Cauldwell. The decree of April 20, 1898, removing the said trustees from their position, is affirmed. All concur.