---

In re BALL et al.

(Supreme Court, Appellate Division, Fourth Department. November 20, 1900.)

EXECUTORS AND ADMINISTRATORS—ASSETS—LOSS—LIABILITY.

Testator, through his attorneys in another state, loaned money on mortgages on property worth more than twice the loan, which mortgages were to run five years, interest payable semiannually, with an option to declare the whole amount due on default in payment thereof. Default was made in the first interest shortly before his death, and on advice of his attor-

neys his executors foreclosed the mortgages for the interest only. The owner of the property offered to pay the mortgages, which, on the advice of counsel and persons interested in the estate, the executors declined, and which, had it been accepted, could not have been fulfilled, because of the mortgagor's insolvency. Afterwards, in order to protect the mortgages, the property was redeemed from a judgment, on the assurance of the attorneys and agents making the loan, and others, that the property would more than pay the amount secured. A panic followed shortly after, and the property was sold for a merely nominal sum. *Held*, that the executors were not liable for the loss, since they were not guilty of gross negligence, nor the exercise of an unreasonable judgment.

Appeal from surrogate's court, Cayuga county.

Proceedings for the settlement of the accounts of Frank H. Ball and another as executors of the will of Edwin J. Dixon, deceased. From a decree surcharging their account with the loss of two mortgages, and with interest and taxes on the mortgaged property, the executors appeal. Reversed.

Edwin J. Dixon, the testator, died on the 14th day of March, 1892, and letters testamentary were issued to the appellants on the 8th day of April following. On the 24th day of August, 1891, the testator had obtained, through Wheeler & Howell, his attorneys and agents at St. Paul, two mortgages upon premises situate in West St. Paul, and designated as blocks 14 and 15, respectively, of Nelson, Stevens & King's addition. These mortgages were intended as security for two interest coupon notes,—one of $3,000 and the other of $4,500. These notes were payable in five years after date, with interest at the rate of 8 per cent. per annum, and were made by Dow Morrison and Mary S. Morrison, and guarantied by Samuel J. Morrison, a brother of Dow Morrison. The interest on these notes was payable semiannually, and in case of default in any payment thereof, and a continuation of such default for a period of 10 days, the principal sum became due, at the option of the payee. The mortgages also contained a like provision. Default was made in the first installment of interest upon each note, which fell due on the 24th day of February, 1892, or just 18 days prior to the testator's death; and, the same remaining unpaid at the time letters testamentary were issued to the executors, they communicated with the firm of Wheeler & Howell in regard to the matter, and on the 2d day of June, 1892, were advised by that firm to foreclose the mortgages for the interest only, and were at the same time assured that the property was ample security for the loans. Shortly thereafter the executors wrote Wheeler & Howell that, in reliance upon their assurance as to the safety of the security, they would authorize them to proceed with foreclosure suits. Proceedings were thereupon commenced, and on the 4th day of August following the executors received a letter from their attorneys informing them that the mortgaged premises had been sold, and bid in for them, and in their name. On the 22d day of October, 1892, Wheeler & Howell wrote the executors that Mr. Morrison wished to know if they would accept payment of the mortgages, both principal and interest; adding that it was his intention to make a new loan, and pay off the mortgages in full. The executors thereupon counseled with their local attorney, and on the 28th day of the same month Frank H. Ball wrote Wheeler & Howell that, as the estate was then situated, the executors could accept the money only at a loss, and, as they deemed the security perfectly good, they did not care to take it up at that time, but that later on they might be glad to have it, and if so they would notify them. No further proceedings were had until August 3, 1893, when Wheeler & Howell wrote Frank H. Ball that the St. Paul National Bank, which had in the meantime obtained a judgment against the Morrisons, had filed notice of its intention to redeem the premises sold upon the foreclosures, and that by the law of Minnesota, of which they were ignorant at the time the premises were sold, a subsequent judgment creditor could redeem by paying the amount of the bid, interest, and sheriff's fees, and take the property discharged of the lien of the mortgages. They further stated that they had obtained control of two small judgments against the Morrisons, which had been

docketed after the bank judgment; that by virtue of these judgments they could redeem from the bank, and advised the executors to take that course, as the only one by which the property could be saved,—at the same time assuring them that there was no doubt but that ultimately they would be able to reimburse themselves for every penny which they were compelled to thus advance. Relying upon such advice and assurance, the executors redeemed from the bank at a cost altogether of about $3,000, after which they made an effort, through Wheeler & Howell, to dispose of the premises; but about this time a panic developed, in consequence of which several banks suspended payment, the price of real estate was greatly depressed, and there were few buyers at any price. As a result of this condition of affairs the mortgaged premises remained on the hands of the executors until 1898, when by order of the surrogate's court they were sold at public auction for a merely nominal sum. On the 8th day of March, 1898, the executors filed a petition for the judicial settlement of their accounts, to which no objection was made at that time, and on the 22d day of April following a decree was entered settling the same; but the proceeding was adjourned to the 31st day of October, 1898, pursuant to a stipulation of the parties, and on the last-mentioned day three of the legatees made answer, by which they sought to surcharge such accounts with the loss upon the St. Paul mortgages, and it is from the decree entered upon the issue thus raised that this appeal is brought.

Argued before ADAMS, P. J., and McLENNAN, SPRING, WILLIAMS, and LAUGHLIN, JJ.

John D. Teller, for appellants.
James Lyon and Frederick E. Storke, for respondents.

ADAMS, P. J. Upon the foregoing facts, and such additional ones as will be referred to later on, the learned surrogate found, as matter of law, that it was the duty of the executors, as soon as possible after their qualification, to exercise their option to declare due the entire principal of the Morrison notes, and to proceed promptly to collect the amount owing thereon. He also found that the executors were guilty of gross negligence in their management of the Morrison loans, in consequence of which they were not entitled to credit, as against the contestants, for any portion of the loss arising therefrom, nor for any items paid out by them on account of such loans subsequent to the 22d day of October, 1892. After a careful examination of the record presented upon this appeal, we find ourselves unable to acquiesce in these conclusions; for, while the executors' management of the Morrison loans has resulted in a substantial loss to the estate, for which devastavit, under some circumstances, they would undoubtedly be held liable, it is to be remembered that the investments with which they had to deal were made, not by the executors themselves, but by the testator in his lifetime; and under these circumstances the law only required of the former that they should act in perfect good faith, and exercise a reasonable degree of judgment in the performance of their duty. In re Porter's Estate (Sur.) 25 N. Y. Supp. 822; O'Connor v. Gifford, 117 N. Y. 275, 22 N. E. 1036. It is undoubtedly the rule that a trustee who invests trust funds in real-estate securities beyond his jurisdiction does so at the peril of being held responsible for the security of the investment. Ormiston v. Olcott, 84 N. Y. 339; Denton v. Sanford, 103 N. Y. 607, 9 N. E. 490. But this rule cannot with any propriety or justice be invoked in the present instance, for the very obvious rea-

son, as has just been stated, that the investments were not made by the executors. On the contrary, they found the securities representing such investments among the assets of the estate which came into their hands; and in these circumstances they were justified in assuming that they had been made by the testator deliberately, and with full knowledge of the situation, condition, and value of the mortgaged property. It is true that the mortgagors had failed to meet the first payment of interest when it became due, and that the same remained unpaid at the time when the executors took possession of the estate. This circumstance, it may be claimed, should have aroused some anxiety in the mind of the latter, lest the securities were not as desirable as the testator had supposed them to be, and doubtless it did; for it appears that the executors at once communicated with the attorneys in St. Paul through whom the loans had been obtained, and were informed by them that it would be advisable to foreclose the interest only, as the mortgages were ample security for the loan. This information and advice would naturally tend to allay any anxiety which may have arisen, and we think, in view of the fact that it came from attorneys who represented the testator, and in whom he had apparently reposed entire confidence, that the executors were fully justified in accepting it and acting upon it. That the information proved unreliable, and the advice absolutely wrong, are circumstances to be regretted, inasmuch as they are probably responsible for a good share of the loss which followed; but they do not necessarily tend to impeach the good faith of the executors, who, so far from being bound to know the law of another state, had a right to assume that lawyers residing in that state, who had been employed and trusted by their testator, were sufficiently learned therein to render their advice and counsel a safe guide to follow. Bank v. Spalding, 9 N. Y. 53; Stedman v. Davis, 93 N. Y. 32. Action taken upon the advice of counsel, when such advice has been sought for and obtained in good faith, tends to establish a defense in certain classes of actions (Hazzard v. Flury, 120 N. Y. 223, 24 N. E. 194; Laird v. Taylor, 66 Barb. 143), and we think should operate as some protection to trustees, who are generally dependent upon such advice, for a mistake of law, if not for an error of judgment (1 Am. & Eng. Enc. Law [2d Ed.] p. 907). The Case of Westerfield (Sup.) 53 N. Y. Supp. 25–39, is so distinctive in its circumstances as to require the application of a different rule of law from the case we now have under review; and consequently it cannot be regarded as of any authoritative force, so far as the present proceeding is concerned.

We have thus far considered questions which are incidental, and in a large measure subsidiary, to the one which is apparently regarded by the learned counsel for the respondents as decisive of the liability of the executors for a devastavit of the estate represented by them, and that it is their refusal to accept what counsel term an offer upon the part of Dow Morrison to pay the mortgages in full. Much that has already been said applies with equal force to this proposition, but in this connection it becomes especially important to again bear in mind that the loans had been made by the testator in his lifetime, presumably upon security which he deemed entirely

satisfactory, and which his attorneys repeatedly informed the executors was ample; and it is hardly necessary to suggest that, had this information proved more reliable, the investments would certainly have been most desirable, inasmuch as they bore interest at the rate of 8 per cent. per annum. It is likewise to be remembered that, at the time Wheeler & Howell wrote the letter of inquiry to ascertain whether the executors would accept payment in full, the notes and mortgages had still about four years to run. In these circumstances the executors would hardly have been justified in accepting payment of the same before their maturity, especially as the money realized therefrom would necessarily have lain idle in their hands, or at all events have earned but a comparatively small rate of interest, until the termination of a litigation involving the estate, which was then pending, would permit a settlement of the estate. Indeed, had they accepted payment under these conditions, it is quite supposable that they might have been compelled to account for any loss of interest which the estate would have sustained in consequence thereof. Aside from these considerations, however, it appears that before declining to consider this proposition the executors had laid the matter before their home counsel, and were advised by him that it would be unwise to take the money before it was due. They also consulted one or more persons interested in the estate, each of whom not only gave the same advice, but expressed a desire to take these very investments to apply on his share of the estate; and, as at this time there had not been the slightest intimation of any danger of redemption by a junior incumbrancer, we are unable to discover anything in the conduct of the executors, so far as their refusal to accept payment of these securities is concerned, which is inconsistent with the utmost good faith. In the light of subsequent events, it appears that it would have been for the interest of the estate for them to have accepted such payment, if it had been tendered, and it may therefore be said, perhaps, that they erred in their judgment; but to say that, under all the circumstances, they were grossly negligent, or that they exercised a judgment which was unreasonable, even if it subsequently proved to be erroneous, would, in our opinion, be subjecting them to a rule which would be more rigid than just.

Our discussion of this feature of the case up to the present time has been upon the assumption that a bona fide offer was actually made to pay off the mortgage, and that the same had been refused, but the facts of the case will by no means warrant such an assumption. It seems that the letter of Wheeler & Howell amounted to no more than an inquiry as to whether a proposition to pay would be entertained; and it now appears that, had it been, in all probability nothing would have come from it, as Dow Morrison was in no position to make good the offer, even if the executors had signified their willingness to accept it. As a matter of fact, both he and his brother were at that very time upon the verge of insolvency; and, while it is undoubtedly true that some little effort was being made by them to obtain a loan which would enable them to pay up the mortgage, the effort, such as it was, proved utterly futile, and was speedily abandoned.

As already suggested, the management of this estate by the executors has been attended with misfortune from the outset, so far as these particular loans are concerned; and, as a consequence, not only has the greater part of the money invested therein been lost, but that which was used in an effort to prevent such loss has met with a similar fate. It does not follow, however, that the misfortune, serious as it is, is chargeable to the negligence of the executors, or either of them. On the contrary, it appears that as soon as they were informed of the mistake made by Wheeler & Howell, and of the advantage which the bank proposed to take of that mistake, one of the executors went to St. Paul, examined the mortgaged property, and inquired of the president of the Produce Exchange and several other parties concerning its value. He was informed by them that, while real estate was somewhat stagnant, this particular piece of property was worth twice the amount of his claim; that it had once sold for $28,000, and was assessed for $13,600. Under these circumstances, it is not surprising that he thought it worth while to attempt to save the estate's claim, even if it were necessary to hold the property until better prices ruled. But just here the spectre of misfortune assumed a new form. A financial panic which no one had foreseen was precipitated upon the country, and one which proved especially disastrous to those Western states where land speculations had been the leading industry. As a consequence, lands which were supposed to be immensely valuable suddenly became comparatively worthless, and those which were relied upon as security for the Morrison loans were no exception to the rule; for the West St. Paul enterprise suddenly collapsed, and the two blocks, which at one time brought $28,000, were ultimately sold under the hammer for $1,000. It is a very easy matter now to see how the disaster which has befallen the estate of Edwin J. Dixon might have been somewhat mitigated, if not entirely avoided. Of course, if the loans had not been made by the testator, there would have been no loss. If his St. Paul attorneys had not made the mistake they did in advising a foreclosure for interest only, or if the executors had not acted upon such advice, it is possible that the entire premises might have been sold for a sum which would have been sufficient to pay the mortgage notes. This, however, is a matter of conjecture only; for it is not altogether improbable that if the executors had availed themselves of their option, and foreclosed for the full amount of their mortgages, they would still have been unable to dispose of the property before its value was affected by the panic. But, be this as it may, in view of all the circumstances of the case we find ourselves unable to reach the conclusion that the executors should be held liable for a devastavit of an estate in which their interest was quite equal to that of the contestant's, without more evidence of bad faith than was made to appear in the present proceeding.

Decree of surrogate's court reversed, and the proceeding remitted to that court for a further hearing, with costs of this appeal to the appellants to abide the event. All concur.