Where an executor consults a competent attorney as to a question involving intricate propositions of law and in good faith acts upon his advice, he is not accountable for the resulting consequences.

[Ed. Note.—For cases in point, see vol. 22, Cent. Dig. Executors and Administrators, §§ 472–482.]

**2. SAME—ASSETS—FAILURE TO COLLECT.**

Where an executor seeks credit for a note alleged to be worthless, the burden of establishing such fact is on him.

[Ed. Note.—For cases in point, see vol. 22, Cent. Dig. Executors and Administrators, § 2172.]

**3. SAME—ADVICE OF ATTORNEY.**

An executor received among the assets of the estate a note payable January 1, 1900, on which was indorsed an agreement to give six months' notice after maturity if payment was required. Testator also held two unindorsed certificates of stock in a corporation of which the maker of the note was president, as collateral. The certificates provided that the stock should be redeemable at par January 1, 1900. The testator died in 1899. The executor, prior to the maturity of the note, consulted an attorney, who advised that no proceedings could be taken to collect the note until the end of the six months provided for in the indorsement, and that no proceedings could be taken until that time to compel the owner of the collateral to have the same redeemed, and the executor acted in accordance with such advice. Held, that he was authorized so to do, and was not chargeable with negligence in so doing.

[Ed. Note.—For cases in point, see vol. 22, Cent. Dig. Executors and Administrators, §§ 394–396.]

**4. SAME.**

An executor held as an asset of the estate a note secured by stock of a corporation of which the maker of the note was president. The evidence showed that the business of the corporation had been declining for several years prior to the date of the maturity of the note, and that at such date both the maker of the note and the corporation were practically insolvent. The stock was redeemable at par on the day of the maturity of the note, but it was improbable that the company would have been able to have redeemed the same at such time, and would probably have gone into the hands of a receiver, as it did at a subsequent date. The note bore an indorsement requiring notice of a demand for payment six months in advance. Held, that the executor was not to blame for not collecting

the amount of the collateral and the amount of the note on the day of its maturity.

5. SAME—CREDIT FOR UNCOLLECTIBLE ASSETS.

Where an executor sued on a note, and it appeared that the maker had been insolvent for a long time, and the corporation, the stock of which had been given to secure the note, was also practically insolvent, and after an attempt to effect a settlement a judgment was entered, and pending supplementary proceedings the judgment debtor died, leaving an estate less in value than $100, the executor was entitled to credit for the non-collection of the note.

[Ed. Note.—For cases in point, see vol. 22, Cent. Dig. Executors and Administrators, §§ 394–396.]

6. SAME.

The maker of a note, held as an asset of the estate, had two policies of life insurance in which his wife was a beneficiary; the proceeds of the same to be paid to the children of the wife in the event of her death. The legal title was by order of the court transferred to the father, and by him to a loan company, in order that the policies might be kept alive for the benefit of the children. The attorney for the executor advised him that it was impossible for him to collect the claim on the note from the amount of such policies. *Held* not to render the executor responsible as for a devastavit on the note.

In the matter of the judicial settlement of the estate of Nicolaus Joost. Account of executor approved.

John H. Steenworth, for executor.

Avery, Schlesinger & Paul, for contestant.

CHURCH, S. The executor in his accounting states that among the assets left by the deceased was a note for $12,000, which was made by one Moritz Hammerschlag, and also two certificates of stock of the Waverly Refining Company, each for 50 shares of the par value of $100, as collateral to the same, but that such note was uncollectible and that the company whose stock was thus pledged as collateral was insolvent, and therefore he was unable to obtain this money for the estate. The contestant, however, asserts that the executor could, with due diligence, have collected such note, and that his failure to collect it is solely attributable to his neglectful and improper conduct, and that therefore he should not be given credit for the amount of the note, but his accounts should be surcharged with the value of the same.

In the accounting of an executor, where he seeks credit for not collecting any asset of the deceased by reason of the same being worthless, the burden of establishing this fact must be borne by the executor, as insolvency of a person, or the mere inability to pay his debts and obligations, will not only be presumed, but, on the contrary, the law indulges in the presumption that all persons are solvent. Matter of Hosford, 27 App. Div. 427, 50 N. Y. Supp. 550. The court in this case held (at page 434 of 27 App. Div., page 554 of 50 N. Y. Supp.) :

"The executors, finding among the estate of the deceased this note for so large a sum, were bound to act with vigilance for its collection; and on the accounting the onus was upon them to show a fair reason why they did not commence an action for its collection. The presumption is that it could have been collected, as the usual course is for men to pay their debts, and solvency is presumed until the contrary is shown."

The question is, therefore, whether the executor has shown affirmatively that he acted with due diligence in endeavoring to collect the note under consideration and that the same was uncollectible notwithstanding that he so acted. The note in question is a somewhat peculiar document. It is dated January 6, 1899; but it was not made payable at any bank or trust company, as is usual in such cases, but at a private house, which was evidently the residence of the deceased. Instead of being made payable at the expiration of two, three, or four months, or on demand, the ordinary and usual course in regard to negotiable paper, it is made payable one year after date. In addition, there is, upon the back of the note, a statement, evidently made at the time of its signing, as follows:

"Brooklyn, Jan. 6, '99. I hereby agree to give six months' notice after this note is due if payment is required.
      "[Signed]                                    Nicolaus Joost.
"John C. Robertson, Witness."

The shares of stock held by the deceased as collateral contain a proviso that such stock was redeemable at par on the 1st day of January, 1900. Such certificates were not indorsed by the maker of the note. It is to be observed that the day of the redemption of such stock is five days previous to the note's becoming due in accordance with the provisions on the face of the note. The counsel for the contestant repeatedly suggested upon the trial that the provision on the back of the note, extending the time of payment for six months, was illegal; and in some of the correspondence between the parties this suggestion was also made, and, in addition, it was contended that certain counsel could establish its illegality. There are no reasons shown why this proviso is illegal, nor is it apparent why it should be regarded as such. For the purpose of the consideration of this case, while this paper is in the form of a note, yet, as it was simply a transaction between the parties and there is thus no question of the rights of third parties involved, it should be treated simply as a memorandum establishing that there was a loan by the deceased to Hammerschlag, with a proviso as to the time of payment of the same. If this was correct, then no proceedings could be taken to collect the amount of such loan until failure to pay the same on July 6, 1900. If Hammerschlag was insolvent at that time, then the executor is not responsible for his inability to collect such note.

But it is also urged that, as Mr. Joost had died before January 1st, when the note became due, it was the executor's duty to collect on the 1st of January (when such collateral became redeemable by such company) the amount of such stock and hold the same as collateral with which to meet the face of the note. This suggestion brings up for careful consideration the proposition of law which the executor contends protects him for his failure to collect the amount due. The testator herein had died before the expiration of the year during which the note was to run. The executor herein had a conversation with Hammerschlag in relation to the payment of the note, and also requested him to indorse the collateral, so that it could be transferred, if necessary. Hammerschlag stated that it was impossible for him to pay this note when it became due, and that he would have to insist upon the six

months' notification provided upon the back thereof; and he also refused to indorse the stock certificates in question. Before January 1, 1900, the executor had this matter submitted to an attorney, a Mr. Greenhall. Mr. Greenhall advised that no proceedings could be taken to collect the note until the expiration of the six months' notification provided for on the back thereof, and that, in the meantime, the executor could not take any proceedings to compel Hammerschlag to indorse the certificates of stock or have the same redeemed on January 1, 1900. Some suggestion is made that the executor did not directly consult Mr. Greenhall in the first instance, but that he took counsel with a man who was only a real estate agent. I do not appreciate the force of this suggestion, so long as it appears that, prior to the 1st day of January, 1900, he had consulted with an attorney and received an attorney's opinion thereon. No suggestion is made that Mr. Greenhall is not a competent and reputable attorney, or that his advice was other than his honest belief concerning the legal status of the situation.

The question, therefore, is not whether or not Mr. Greenhall's advice was correct as a matter of law, but was the executor, who in good faith sought such advice and followed it, discharging his duty by the estate, or was it his duty, upon the receipt of such advice, to disregard it and proceed to endeavor to collect this note? The executor is only required to bring to the discharge of his duties the intelligence which an ordinarily good business man would use in like matters; and where, in the course of the administration of his trust, he is confronted with any question which requires the advice of a skilled specialist and in good faith seeks such advice, receives the same, and acts thereon, he is not held accountable for the consequences of following it. And this is particularly true of intricate propositions of law. If, in spite of the advice of his counsel herein, he had persisted in instituting an expensive litigation for the purpose of endeavoring to realize upon this note, and the final result of the same had been disadvantageous to the estate, he would have been criticized for bringing such a fruitless action and would have been compelled to bear the expenses thereof himself. O'Connor v. Gifford, 117 N. Y. 275, 22 N. E. 1036. At page 280 of 117 N. Y., page 1038 of 22 N. E., the court said:

"In this case we cannot see that the executor, under all the facts, was guilty of such a lack of diligence as should charge him with the value of these bonds. The result of a suit was entirely too doubtful to require us to hold the executor liable for not instituting it, especially when in good faith, and after, it is to be presumed, a full statement of all the facts, his counsel advised him that he had no case, and he believed it and acted accordingly."

Matter of Ball, 55 App. Div. 284, 288, 66 N. Y. Supp. 874, 877, states that the "executor had a right to assume that lawyers residing in that state who had been employed and trusted by their testator were sufficiently learned therein to render their advice and counsel a safe guide to follow." Therefore the executor acted upon the advice of counsel, who assured him that he had no rights on January 1st to have the collateral redeemed and that any litigation looking to that end would be fruitless, and the executor, by following such advice, is absolved from blame.

But, conceding that this was a doubtful question, let us examine the question as to whether any such litigation could have been instituted and, if so instituted, whether any effectual result would have been secured for the estate thereby. The executor shows that the business of this refining company, of which Hammerschlag was the president, had been declining for two or three years prior to January 1, 1900; that several of the prominent men in the company had resigned from the same and organized opposition companies; that Hammerschlag had been trying to keep the same alive by means of loans which he obtained from confiding friends, such as the loan which he obtained from the testator herein; and that at the period in question, January 1, 1900, both Hammerschlag and the said company were practically insolvent, Hammerschlag keeping the company alive solely in the hope that he might realize something from the trust which was in contemplation of being organized. The testimony of the contestant not only does not contradict this condition of affairs, but, on the contrary, seems to substantiate it, as the allegations with reference to the time when the company was doing a good business and paying dividends placed it at a period anterior to 1898; and, although the persons who are examined by the contestants were interested in the same line of business, they make no attempt to show that the company was solvent on January 1, 1900, with the exception that it is shown that one man who had 50 shares of stock had the same redeemed on that day. It is not shown, however, that such stock was redeemed by the company; but, on the contrary, it appears that the son-in-law of Hammerschlag, anticipating that the man who owned such stock, who was a rival to such business, would insist on the payment of the same, raised the money so as to get rid of the consequence of a failure to redeem. It is not shown that any of the other stockholders of such company were enabled to get their stock redeemed on such day, and the evidence, as a whole, justifies the conclusion that, even assuming that the executor was the owner of such stock and in a condition to present the same for redemption, it was extremely doubtful whether the company would have been able to pay any portion of the same; and it is also probable that the company would have gone into the hands of a receiver, as it did at a subsequent period.

With this doubtful question of the solvency of the company and with the doubt in relation to the legal status of the executor in regard to this stock, it certainly would be an extreme application of the law covering the conduct of trustees to hold that he was responsible for not in some way collecting the amount of money represented by the face of this collateral. The only thing, it seems to me, that possibly could be suggested was that a suit might have been instituted in equity by the executor to have the company set apart the value of the face of the collateral, so that, in the event of the note not being paid in July, the sum so set apart could be applied to the payment of the same. I am not prepared to say whether such an action as this could be sustained in equity or not, as it does not seem to me that that is the measure of a trustee's duty. He is not required to use efforts which have not been tested and which are contrary to the views of counsel, even if some other

counsel might possibly have suggested this line of conduct and succeeded. It is not shown that any other counsel advised this method, nor is it shown that this was a common procedure of which an ordinary business man would take cognizance. On the contrary, the correspondence shows that, while parties were prepared to criticise the executor and were desirous that this note should be paid, there was no affirmative statement suggesting this line of legal conduct. The executor was, therefore, not to blame for not collecting the amount of this collateral on January 1, 1900, or for not collecting the note on January 6, 1900.

The sole other question is whether, when the note became due in July, due diligence was used in the endeavor to collect the same. It appears that, immediately upon the expiration of the time within which the note was to be paid, the same was placed in the hands of counsel for collection. Shortly thereafter suit was instituted by the attorney against Hammerschlag to recover the amount of such note. In addition, the said counsel instituted a careful examination into the affairs of Hammerschlag, and as a result of such examination it became evident that Hammerschlag had been for a long period of time practically insolvent and that also for the like period of time the corporation had been in a state of insolvency. After endeavoring to see if some possible settlement could not be made by means of Hammerschlag's raising the money from some other source, judgment was finally entered thereon from which the execution was returned unsatisfied. Examinations were held from time to time of said Hammerschlag in supplementary proceedings, but he died before the same were terminated. The will of Hammerschlag was admitted to probate in this city. In the probate proceedings it was recited that the value of his entire estate did not exceed the sum of $100. None of these allegations of the executor, which it is to be observed were made after careful examination, is disputed or contradicted in any way by the contestant. Nor is there any specific suggestion of anything that the executor could have done at this period as against Hammerschlag or the Waverly Refining Company which would have resulted in the payment of the note in question.

It appears, however, that a few years later the administratrix with the will annexed of Hammerschlag collected the sum of $8,000 insurance, which was immediately distributed; and, although it is not shown that the executor had any knowledge of the collection of this insurance, or that there was any such amount due, yet it is sought to charge him for not collecting the same. The facts surrounding the insurance policies upon which the money was realized are as follows: Hammerschlag had his life insured in two policies in which his wife was named as a beneficiary, with a proviso that, in the event of her death, the moneys realized therefrom should be paid to her children. In 1898, in a petition to the court in New Jersey, in which he was guardian of two of the children who were under age, he recited that his wife had died and he was unable to longer maintain such policies to to pay the premiums thereon; that an arrangement had been effected by which, if the policies were made payable to him, he would transfer the same to a loan company, which would advance the moneys to take

care of the premiums so as to keep the said policies alive; that the adult children of his wife were willing to sign such a provision; and that he asked leave of the court, as the guardian of his infant children, to join in such contract. An order of the surrogate's court was made accordingly, and the policies were made payable to said deceased; and he thereupon assigned to the loan company in question his rights under such contract. Upon his death, the amount due on such policies was reckoned up, and, after paying to such loan company the amount which it had advanced thereon and to which it was entitled under the contract in question, a balance amounting to $8,000 was paid as hereinbefore recited.

As I view the transaction in relation to these policies, assuming that the executor herein had been cognizant of the fact that this money was about to be paid, and assuming that he had attempted to issue execution or attach such moneys, yet such conduct would have been unavailing. The equitable title to such policies unquestionably remained in the children, notwithstanding the legal title may have been transferred to deceased, Hammerschlag, and by him to such loan company; and the courts would have held that such transfer, having been made for the benefit of the children in order that such policies might be kept alive and something realized thereon for their benefit, it could not be said that, in the effort to keep the same alive, it was intended to make the policies responsible for the debts of the deceased. The fact that the deceased was heavily involved was made apparent at this time. It was submitted to the court as a basis for this proceeding, and, if after this transfer the policies were to become responsible for the debts of the deceased, they might as well have been permitted to lapse entirely. The attorney for the executor admits that a statement in connection with this matter was submitted to him by Mr. Hammerschlag, and that in his judgment it was impossible for the executor to have collected such policies. The facts, therefore, do not justify the holding of the executor responsible as for a devastavit on this note.

It is, no doubt, unfortunate that this estate is unable to collect this large amount of money, which was unquestionably due to the deceased; but it must be appreciated that the fault, if any, is rather due to the act of the testator in making such a loan and accepting thereon the doubtful security offered to him by Hammerschlag. He having done this, we should not exact from the executor herein that he should accomplish the impossible or indulge in expenses which would only result in the sending of good money after bad. The account of the executor is therefore approved, and he is allowed the credit for not collecting the note in question.

Decreed accordingly.